**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ADANI EXPORTS LIMITED,** )  | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No. 05-304** |
| ) | |
| **AMCI EXPORT CORPORATION,** ) | |
| **AMERICAN METALS & COAL** ) | |
| **INTERNATIONAL, INC., K-M** ) | |
| **INVESTMENT CORPORATION,** ) | |
| **FRITZ R. KUNDREN, HANS J.** ) | |
| **MENDE, ERNIE THRASHER, XCOAL** ) | |
| **ENERGY & RESOURCES and** ) | |
| **XCOAL ENERGY & RESOURCES,** ) | |
| **LLC,** ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION AND ORDER OF COURT</u>

Before the Court for disposition are PLAINTIFF'S MOTION FOR SUMMARY

JUDGMENT (*Document No. 128*), Plaintiff's Brief in Support of Motion for Summary Judgment

(*Document No. 130*), DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (*Document*

*No. 131*), Defendant's Memorandum of Law in Support of Motion for Summary Judgment

(*Document No. 132*), Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for

Summary Judgment (*Document No. 135*), PLAINTIFF'S MOTION TO STRIKE THE

AFFIDAVIT OF COLIN GUBBINS (*Document No. 137*), Plaintiff's Brief in Support of Motion

to Strike the Affidavit of Colin Gubbins (*Document No. 138*), PLAINTIFF'S MOTION TO

STRIKE OPINION TESTIMONY OF SYED KAZIM (*Document No. 139*), Plaintiff's Brief in

Support of Motion to Strike Opinion Testimony of Syed Kazim (*Document No. 140*), Plaintiff's

Brief in Opposition to Defendant's Motion for Summary Judgment (*Document No. 141*),

Plaintiff's Reply Brief in Support of Motion for Summary Judgment (*Document No. 146*),

Defendant's Reply Brief in Support of Motion for Summary Judgment (*Document No. 147*),

Defendant's Response in Opposition to Plaintiff's Motion to Strike Opinion Testimony of Syed

Kazim (*Document No. 150*), Defendant's Response in Opposition to Plaintiff's Motion to Strike

the Affidavit of Colin Gubbins (*Document No. 151*), PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S SUPPLEMENTAL CONCISE STATEMENT OF MATERIAL FACTS (*Document No. 152*), Plaintiff's Reply Brief in Support of Motion to Strike Opinion Testimony of Syed Kazim (*Document No. 153*), Plaintiff's Reply Brief in Support of Motion to Strike the Affidavit of Colin Gubbins (*Document No. 154*), and Defendant's Response in Opposition to Plaintiff's Motion to Strike Defendant's Supplemental Concise Statement of Material Facts (*Document No. 155*). For the reasons that follow, all five pending motions will be denied. The motions for summary judgment will be denied because a genuine issue of material fact exists as to whether a contract was formed, the motion to strike the opinion testimony of Syed Kazim will be denied because it is without merit, and the motions to strike the affidavit of Colin Gubbins and the supplemental concise statement of material facts will be denied because they are moot.

## Background

Plaintiff Adani Exports Limited ("Adani") is a public limited company incorporated under the laws of the Republic of India. Doc. Nos. 129 & 136, ¶ 1. Adani's shares are traded on the Mumbai Exchange, the Ahmedabad Exchange and the National Stock Exchange of India. *Id.*, ¶ 2. Adani maintains its headquarters in Ahmedabad, India. *Id.*, ¶ 3. It also has offices in Mumbai and New Delhi, both of which are in India. *Id.* Adani is a global trader of commodities. *Id.*, ¶ 4. As a result of a name change, Adani is formally known as Adani Enterprises Limited. *Id.*, ¶ 5.

Adani's Energy and Mineral Division imports coal into India for the purpose of selling it to a variety of Indian customers. *Id.*, ¶ 6. Pradeep Mittal ("Mittal") became the President of Adani's Energy and Mineral Division in 1998. *Id.*, ¶ 7. He became the Chief Executive Officer ("CEO") in 2003. *Id.* As both the President and the CEO of the Energy and Mineral Division, Mittal is responsible for its day-to-day management and oversight. *Id.*, ¶ 8. Vinay Prakash Goel ("Goel") became a Senior Manager of the Energy and Mineral Division in 2001. *Id.*, ¶ 9. Although he has since become a General Manager, his duties have remained essentially the same. *Id.*, ¶ 10. His responsibilities include arranging operations and logistics for coal contracts and assisting Mittal in both the sourcing and marketing of coal. *Id.*, ¶ 11. Goel has negotiated contracts on behalf of Adani. *Id.*, ¶ 12.

Adani Global FZE is a limited liability company registered under the Jebel Ali Free Zone under the laws of Dubai. *Id.*, ¶ 13. Dubai is one of the United Arab Emirates. *Id.* Adani Global FZE is a wholly owned subsidiary of Adani Global Limited, Mauritius, which is itself a wholly owned subsidiary of Adani. *Id.*, ¶ 14. Adani Global PTE is a limited liability company organized under the laws of Singapore. *Id.*, ¶ 16. It is also a wholly owned subsidiary of Adani Global Limited. *Id.*, ¶ 17. Defendant AMCI Export Corporation ("AMCI Export") is a global trader of coal. *Id.*, ¶ 20. AMCI Export maintains its headquarters in Latrobe, Pennsylvania. *Id.* Ernie Thrasher ("Thrasher") has served as the President of AMCI Export since 1997. *Id.*, ¶ 25.

Syed Kazim ("Kazim") is a citizen of India. *Id.*, ¶ 26. In 1988, he graduated from Loyola College in Chennai, India. *Id.*, ¶ 27. He later earned a Masters in Business Administration ("MBA") in International Management from Aligarh University in Aligarh, India, and a Masters in Business Economics ("MBE") from King Fahd University of Petroleum and Minerals Dhahran. *Id.* In 1994, Kazim began trading coal for the Emirates Trading Agency ("ETA") in Dubai. *Id.*, ¶ 28. He left the ETA to trade coal for Masefield, a trading firm, from a base in Singapore. *Id.*, ¶ 29.

Thrasher and Kazim met in Hong Kong during the latter part of 1999. *Id.*, ¶ 30. Kazim was apparently designated to be AMCI Export's agent in India. *Id.*, ¶ 31. After the meeting, Kazim formed an Indian company named AMCI India Pvt. ("AMCI India"). *Id.*, ¶ 32. On February 1, 2000, AMCI Export and AMCI India executed an agreement known as the "Agency Agreement." *Id.*, ¶ 33. AMCI Export's business in India was conducted through AMCI India. *Id.*, ¶ 35. AMCI India was apparently paid around $20,000.00 per month by AMCI Export for its services. *Id.*, ¶ 36. Throughout the course of the agency, Kazim made sales calls and offers to sell coal only in consultation with AMCI Export. *Id.*, ¶ 37. Kazim never made an offer for the sale of coal on behalf of AMCI Export without first obtaining AMCI Export's authorization. *Id.*, ¶ 38. Thrasher is not aware of any instances in which AMCI India offered to sell coal on behalf of AMCI Export in the absence of AMCI Export's prior approval. *Id.*, ¶ 39. Syed Matheen ("Matheen") participated in some of the operational aspects of AMCI India's business, including the coordination of vessels and letters of credit and the documentation of coal shipments. *Id.*, ¶ 40.

On December 5, 2003, Goel sent Kazim an email requesting a "formal offer" for the supply of coal. *Id.*, ¶ 41. Kazim responded via email on December 10, 2003, purporting to submit an "offer" for Adani's "kind acceptance." Doc. No. 129-2, p. 10. The coal being offered to Adani by AMCI Export was apparently being offered so that Adani could resell it to Maharashtra State Electricity Board ("MSEB") and/or Gujarat Narmada Valley Fertilizer Company Ltd. ("GNFC"). Doc. Nos. 129 & 136, ¶ 42. Thrasher was aware of, and authorized, AMCI India's communication with Adani. *Id.*, ¶ 45. The communication proposed AMCI Export's sale of 65,000 metric ton shipments of steam coal spread evenly between the months of January 2004 and June 2004. Doc. No. 129-2, p. 16. Two optional shipments were also included. *Id.* A memorandum from Kazim to Mittal stated, in pertinent part, as follows:

> We have offered coal of both Chinese and Australian origins. AMCI would back the offered tonnage ex-Australia for its reliable supply & superior quality. However if the MSEB and/or GNFC business is awarded to Adani Exports Ltd (AEL), a portion or all the tonnage could be substituted from China, in AMCI's discretion, subject to the coal with right quality & at right price being available.
>
> If the switchover to China is successful, then the CFR price differential between China & Australia will be split equally between AMCI & AEL.
>
> ***
>
> AMCI reserves the exclusive option/right to supply steam coal of either Australian or Chinese origin. Ocean freight will be worked by both AMCI & AEL. The cheaper offer will be taken into consideration for each shipment.
>
> ***
>
> All other terms shall be mutually agreed. We look forward to your valuable association for this business & thank your good self for the opportunity. Kindly acknowledge receipt of our offer.

*Id.*, pp. 16-18. The memorandum further stated that it was valid until December 20, 2003. *Id.*, p. 18. A copy was sent to Thrasher. *Id.*, p. 16.

Goel responded to Kazim's email on December 10, 2003. *Id.*, p. 13. He indicated that he needed a support letter for GNFC. *Id.* Kazim forwarded Goel's response to Matheen the next day, accompanied by the notation, "Pls arrange for the supporting letter on priority." *Id.* A

Namoi Mining Pty. Ltd. support letter dated December 10, 2003, and signed by Darlene Miller ("Miller"), was provided.  *Id.*, p. 20.

Mittal and Kazim apparently discussed the possibility that the validity of the offer could be extended until January 11, 2004.  In an email to Kazim dated December 14, 2003, Goel stated:

> This has reference to the discussion you had with Mr. Pradeep Mittal.  As discussed the validity of your offer is till 11th January 2004.

*Id.*, p. 23.  That same day, Kazim responded via an email to Goel, stating:

> We confirm the extension.  However, it is mutually understood & agreed by Mr. Mittal that Adani Exports will stand by AMCI prices & all commercial terms, through the offer & delivery period.

*Id.*  Kazim confirmed the extension in a handwritten notation dated December 16, 2003, which was written at the bottom of the original communication proposing the sale.  *Id.*, p. 18.

Goel emailed Kazim on January 6, 2004, seeking a further extension of the offer until January 31, 2004.  *Id.*, p. 22.  The reason given for this request was that MSEB and GNFC were taking more time to finalize their orders.  *Id.*  One day later, Kazim responded by informing Goel and Mittal that the validity of the offer could not be extended further without a revision of the price.  *Id.*  Kazim and Mittal apparently had a meeting at an AMCI India office on January 9, 2004.  On January 10, 2004, Kazim sent a memorandum to Mittal.  *Id.*, p. 26.  A copy of the memorandum went to Thrasher.  *Id.*  It stated as follows:

> Subject-**Supply of steam coal to MSEB/GNFC**
>
> We refer to our offer dated December 10, 2003 & your subsequent visit to our office yesterday.  Further with reference to our telecon of this morning & at your request, we acknowledge in writing your confirmation of purchase as per all the terms/conditions stated in our offer of December 10, 2003.
>
> The following must be kindly noted, in line with our offer:
>
> > 1.  AMCI retains the right to supply coal of either Chinese or Australian origins
> >
> > 2.  AMCI will approach the freight market to assess the freights between China & India versus Australia & India, in order to estimate the freight

differential.

*Id.*  Mittal responded with a memorandum to Kazim dated January 11, 2004, in which he stated:

This has reference to your fax message dated 10th January 2004.

We also hereby confirm 4 vessels of 65,000 MT +/- 10% each towards your offer dated 10th December 2003.

As regard to freight, the same can be finalised latest by Wednesday, 14th January 2004.

*Id.*, p. 28.

Mittal and Kazim apparently spoke on January 13, 2004.  *Id.*, p. 30.  The next day, Mittal sent Kazim an email stating, in pertinent part, "As discussed, please confirm that your offer stands valid till 31st January, 2004."  *Id.*, p. 30.  On January 16, 2004, Kazim sent Goel an email stating that freight would be fixed on a "shipment to shipment" basis, since both companies could save "substantial monies" if Chinese coal were to become available.  *Id.*, p. 33.

Kazim sent an email to Mittal dated January 17, 2004, which stated as follows:

We agree to the extension.  However, as discussed all terms & conditions from our offer of December 10, 2003 remain strictly unchanged.

*Id.*, p. 30.  Goel sent Kazim an email on January 20, 2004, in which he stated:

Thanks for extension of your offer extension till 31.01.2004.

We agree with you that supply of Chinese coal by you can give us also a savings but please be informed that option of supplying coal from either China or Australia is with U only.  In finalizing freight on vessel to vessel, we may lend up loosing if U opt to give us all Australian vessel as we are finding difference of more than 3-4 USD PMT between COA and spot vessels and also it will disturb our delivery schedules.

Also we need to have clarity to plan our discharge port laycan to inform to our customers in advance.

So in any case, we need to firm up before 31.01.2004 that how many vessels are going to be from Australia and how many from China and at what rates.

*Id.*, p. 32.  Kazim responded the next day with an email informing Goel that AMCI Export could not give up its right to supply coal from either origin on a "shipment to shipment" basis.  *Id.*

On January 29, 2004, Mittal sent the following letter to Kazim:

This has reference to your offer dated 10th December 2003, which was further extended to 31st January 2004, your confirmation dated 10th January 2004, our confirmation dtd. 11th January 2004 and subsequent e-mail message dated 16th January 2004.  We once again confirm to purchase four (4) firm & two (2) optional vessels between February-July 2004 as per your offer.

We also confirm to finalise the freight on shipment to shipment basis as suggested by you vide your e-mail message dated 16/1/2004, though it will be a costly affair for us.

We have already nominated vessel MV FILLIP LEMBO OR SUB on yesterday AM for which we request you to kindly send us your confirmation on immediate basis.

*Id.*, p. 43.  Kazim forwarded Mittal's letter to Thrasher, with handwritten notations reading "Pls refer our email exchange of today" and "2 optional cargoes in AMCI's discretion, which we cancelled."  *Id.*

While all of this was going on, the parties were engaged in discussions about freight.  On January 22, 2004, Kazim sent the following email message to Thrasher:

Mr. Mittal & Mr. Rajesh Adani have confirmed offtake of 4 cargoes & are seeking to conclude a COA with a vessel owner.

I have asked them to follow the offer strictly wherein we retain the right nominate "origin on a shipment to shipment"basis–this has become a major irritant for them, in a rising freight market.

*Id.*, p. 36.  On January 28, 2004, Goel sent Kazim a letter purporting to nominate a vessel "for performance of our coal shipment."  *Id.*, p. 38.  Kazim forwarded the letter to Thrasher.  *Id.*, p. 41.  Thrasher responded by informing Kazim that AMCI Export had accepted a nomination from "NSC" for a loading in February 2004, and that it had obtained "firm offers for tonnage at $40."  *Id.*  Kazim proceeded to email Thrasher on January 29, 2004, as follows:

Nippon Steel biz is very pleasing.  As stated, we should try & make the best possible margin in the spot mkt.  We get such opportunities once in several years.

> Although the pressure is tremendous from Rajesh Adani & Pradeep Mittal, i'm not accepting their vessel nomination for now. I've verbally informed them that loading will be delayed until April. We'll watch the situation then & act accordingly.
>
> We could give them one of the remaining two cargoes during May/June & sell the other at a higher price. They'll eventually agree for an extended delivery period.

*Id.*, p. 40. Thrasher expressed his agreement with Kazim's assessment in a responsive email, referring to the situation as "a once in a lifetime chance to make some money." *Id.*

On February 3, 2004, Kazim sent a memorandum to Goel which stated, in pertinent part: "We regret to advise our inability to supply you the required cargo in the immediate future for reasons beyond our control." *Id.*, p. 45. In an email to Goel dated February 4, 2004, Kazim stated:

> If the quota system is implemented, as called for by one big producer, AMCI may not be able to ship your coal for a LONG TIME. The QUOTA SYSTEM may be based on actual production & prorate usage of New Castle Port & obviously the big 1-2 producers will have more coal to offer to Japan for 2004 after eliminating the queue.
>
> Coal vsls will continue to load in chronological order. Contracts fixed as early as November/December 2003 will get precedence over those concluded later, which is only fair. As regards MSEB & GNFC, I had clearly cautioned all concerned not to commit prompt delivery schedules & fix vessels for sometime.

*Id.*, p. 48. Terry Rhodes ("Rhodes") works for AMCI Australia Pvt. On February 21, 2004, Kazim emailed the following message to Rhodes:

> To enable me justify delayed delivery (reason beyond our control) to the Indian customers, could you get us a e-mail/fax request from Mr. Ian Stocks stating they require an extension of the delivery period to September, 2004 with reference to AMCI contract, due to supply problems from the mine.
>
> I believe if we do not come with something valid & in writing, Indians will shortly commence RISK PURCHASE & debit us the difference plus spoil the relationship.
>
> Pls give this aspect a thought. Yr help in this regard will be very useful in protecting the relationship with Indian customers.

*Id.*, p. 75.  In an email dated February 24, 2004, Rhodes responded to Kazim as follows:

> Note attached message from Warkworth which summarises discussions that I have hed with them regarding their coal supply shortage following several production problems resulting in them being between 300,000 and 400,000t NEGATIVE on stocks over coming months.
>
> This is the reason they have asked for our agreement to the deferral of shipments back to as late as September 2004.

*Id.*, p. 90.  The attached message read:

> Nicole has confirmed coal availability for the "Dyna Auk" laycan 10-20 March.
>
> ***
>
> To facilitate your requirement to lift up to 264kt under this contract the delivery period is to be extended until 30 September,2004.
>
> ***
>
> Considering these facts there may well be a case for WW declaring FM but rather than proceed that way at this stage, we are looking to defer shipments in the April-June period.

*Id.*, pp. 91-92.  Kazim responded to Rhodes' email:

> This might be acceptable.  Ofcourse, the first line accepting mv Dyna Auk suggests that we are still loading cargoes.
>
> Pls note preferred wording that conveys the problem in a straightforward manner . . .
>
> The original agreement was made on the basis of 240kt+/-10% (shipping tolerance) to be lifted by 30 June, 2004.  Notwithstanding, at this stage tonnage cannot be confirmed.
>
> Under the current extremely tight supply situation we would ask that you seriously consider changing your requirement by few months.  Can you please confirm your agreement to the above.

*Id.*, p. 89.

Kazim also sent the following email to Rhodes on February 24, 2004:

> As discussed, the other issue is that we are not in a position to convey to Adani & SSOE that the Warkworth cargoes, whenever available, will be offered to them.
>
> Atleast we can try to salvage the situation by seeking an extended delivery period, hoping the supply situation improves over time & we can honour our commitments.

*Id.* On February 29, 2004, Kazim sent Thrasher an email indicating that Mittal was upset about the delayed delivery. *Id.*, p. 98. Kazim indicated that he was going to meet with Mittal. *Id.* In a responsive email to Kazim, Thrasher stated as follows:

> I agree that it's god to meet with Adani. Since we are not a party to Adani's contracts with their domestic clients, and our contract with Adani was not for a specific domestic client, we cannot accept responsibility for their exposure to these customers.

*Id.*, p. 97. Kazim responded to Thrasher's comments via email:

> For the sake of clarity, we do not have a signed contract with Adani.
>
> However their enquiry & our subsequent offer in December 03 were specifically meant for GNFC & MSEB. The important point is that our offer did not include any penalties for delayed delivery/non-delivery.

*Id.* On March 2, 2004, Kazim sent Mittal a message concerning problems with the coal supply. Doc. No. 129-3, pp. 2-3.

> Kazim emailed Rhodes on March 11, 2004, stating as follows:
>
> Vinay Prakash of Adani Exports called to address the issue of our non performance & emphasise on the "relationship factor". In short, i think this situation will lead them to ending any business relationship with AMCI or personal relationship with me. Obviously, they are losing a lot of money trying to buy replacement tonnage. I did not take call from Mr. Gautam Adani as i cannot mislead him. [] It would be best if we can atleast give them one cargo, if still available, to prove that we always had the right intention (Terry, pls advise). [] If not tonnage, we might still consider offering monetary compensation to Adani. I do not have a solution to SSOE problem.

*Id.*, p. 5.

> Kazim met with Adani personnel on April 7, 2004, to discuss the situation. Doc. Nos.

129 & 136. The next day, Kazim provided Thrasher with a written summary of the meeting. Doc. No. 129-3, p. 7. Kazim indicated that Adani was holding him personally responsible for AMCI Export's failure to provide coal. *Id.* On April 10, 2004, Mittal wrote to Thrasher:

> I earnestly request you once again to please solve this issue amicably considering our cordial relationship both personal and official between the two companies. My Chairman, Mr. Gautam Adani has taken a very serious note on the failure in honouring the commitment by AMCI. If you see the past record in the last couple of years, you will find that we have always been buying Australian Coal only from AMCI. We were forced to go to other suppliers for Australian Coal only when AMCI refused to supply. First refusal right has been given to AMCI. This is only because of our relationship with AMCI.
>
> Ernie to be brief, it is my sincere and last request to you to kindly address this issue to us and please help us out of this loss making situation. If we do not hear from you soon, we will have no other alternative but will be forced to take unpleasant steps.

*Id.*, p. 11. In a subsequent letter to Thrasher dated May 7, 2004, Mittal stated as follows:

> This has reference to several of our earlier letters and emails to you. Tried to contact you a number of times too but all in vain as was not able to get through to you.
>
> Ernie, I am very disheartened to state that neither you nor your Chennai Office had the courtesy to reply to our letters or even acknowledge them. We now hold you in breach of contract. As such, we are enclosing here our Debit Note for USD.7,644,000/- towards the difference in the price, ocean freight and custom duty.
>
> You are requested to please remit us the amount within 7 days from the date of receipt of this letter. Thereafter interest at 15% will be levied on account of delay in payment.

*Id.*, p. 14. AMCI Export has not delivered any coal to Adani since December 2003. Doc. Nos. 129 & 136, ¶ 118.

## Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. When the non-

moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-250.

**Discussion**

The parties have filed cross-motions for summary judgment with respect to the issue of contract formation. Doc. Nos. 128 & 131. Since jurisdiction in this case is based on the diverse citizenship of the parties, the Court must apply the choice of law rules applicable in the Commonwealth of Pennsylvania. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 496-497 (1941). There is no need for a detailed choice of law analysis, however, because the parties agree that Pennsylvania's substantive law governs the issue of contract formation. Doc. Nos. 101 & 102. On matters to which the Pennsylvania Supreme Court has not yet spoken, this Court must predict how the Pennsylvania Supreme Court would rule if it was presented with the same issue. *Employers Mutual Casualty Co. v. Loos*, 476 F.Supp.2d 478, 487 (W.D.Pa. 2007). In making such a prediction, the Court may consider decisions of lower Pennsylvania courts, as well as decisions of federal appellate and district courts applying Pennsylvania law. *United States Fid. & Guar. Co. v. Tierney Associates, Inc.*, 213 F.Supp.2d 468, 471 (M.D.Pa. 2002). The Court may also consider decisions from courts in other states discussing similar legal principles, to the extent that such principles are not inconsistent with Pennsylvania law. Pennsylvania courts often look to decisions rendered in other jurisdictions for guidance in ascertaining the law of Pennsylvania. *Sabad v. Fessenden*, 825 A.2d 682, 695 (Pa.Super.Ct. 2003). For instance, the Pennsylvania Supreme Court *requires* attorneys to evaluate related precedents from other jurisdictions when briefing the interpretation of analogous provisions of the Pennsylvania Constitution. *Commonwealth v. Edmonds*, 586 A.2d 887, 895 (Pa. 1991). Reliance on decisions from other jurisdictions is particularly appropriate in a case such as this, which is governed by the provisions of the Uniform Commercial Code ("UCC"). Pennsylvania, like most jurisdictions in the United States, has adopted the UCC. While decisions from other jurisdictions may prove to be helpful in most contexts, the Pennsylvania Supreme Court has made it clear that such decisions "are entitled to even greater deference where consistency and uniformity of application are essential elements of a comprehensive statutory scheme like that

contemplated by the Uniform Commercial Code." *Commonwealth of Pennsylvania v. National Bank & Trust Company of Central Pennsylvania*, 364 A.2d 1331, 1335 (Pa. 1976). The Court evaluates the parties' cross-motions for summary judgment with these principles in mind.

Before addressing the parties' motions for summary judgment concerning the issue of contract formation, the Court must dispose of Adani's motions to strike. After a thorough review of the evidence contained in the record, the Court is convinced that a genuine issue of material fact exists as to the issue of contract formation regardless of whether the affidavit of Colin Gubbins ("Gubbins") is considered. In its brief, Adani argues that AMCI Export's presentation of the Gubbins affidavit for purposes of summary judgment violates stipulations agreed to by the parties and constitutes "unfair surprise" within the meaning of 13 Pa.C.S. § 1205(f).[1] Doc. No.

---

[1]Federal Rule of Civil Procedure 26(a)(2)(C) requires parties to disclose expert witnesses at least 90 days before trial "[i]n the absence of other directions from the court or stipulation by the parties[.]" Adani contends that AMCI Export's filing of the Gubbins affidavit violates Rule 26(a)(2)(C) because the parties had previously stipulated that expert witness discovery would be completed prior to the filing of motions for summary judgment. Doc. No. 138, p. 2. In support of its argument, Adani relies on a joint stipulation to amend an earlier case management order. Doc. Nos. 30 & 31. As AMCI Export points out, however, the Court never formally adopted the case management order proposed by the parties' stipulation. Doc. No. 151, p. 5. Moreover, the Court's case management order of November 20, 2006, which permitted discovery to proceed only as to the issue of contract formation, is silent as to Rule 26(a)(2) expert witness disclosures. Doc. No. 94. The case management order was amended on May 8, 2007, but the amended order was likewise silent as to Rule 26(a)(2) expert witness disclosures. Doc. No. 112. On June 18, 2007, this case was reassigned to Judge Nora Barry Fischer. Doc. No. 115. A status conference was held before Judge Fischer on July 12, 2007, at which the parties agreed that their motions for summary judgment would be filed by September 17, 2007. Doc. No. 118. Judge Fischer entered an order adopting the briefing schedule which had been agreed to by the parties. Doc. No. 119. Her order said nothing about Rule 26(a)(2) expert witness disclosures. *Id.* On August 29, 2007, Judge Fischer recused herself from this case in accordance with 28 U.S.C. § 455, thereby directing the Clerk of Court to return this case to the undersigned. Doc. No. 124. Having reviewed the procedural history in considerable detail, the Court acknowledges that no prior order issued by either Judge Fischer or the undersigned ever specifically addressed the issue of expert witness disclosures under Rule 26(a)(2). Hence, the Court agrees with AMCI Export's argument that it was entitled to rely on the 90-day pretrial default timeframe established by Rule 26(a)(2)(C). The question of whether AMCI Export's filing of the Gubbins affidavit constitutes "unfair surprise" within the meaning of 13 Pa.C.S. § 1205(f) is a closer call, but the Court need not address that issue in light of its determination that a genuine issue of material fact exists as to the issue of contract formation regardless of whether the Gubbins affidavit is considered for the

138, pp. 6-16. Adani also contends that Gubbins' testimony is inadmissible under Federal Rule of Evidence 702.[2] *Id.* The Court need not address these evidentiary issues on the merits, however, because there is a genuine issue of material fact as to whether a contract was formed regardless of whether the Gubbins affidavit is admissible. Consequently, Adani's motion to strike the Gubbins affidavit will be denied as moot. Doc. No. 137. Since the Court's determination that a genuine issue of material fact exists as to whether a contract was formed is not dependent on anything included within AMCI Export's supplemental concise statement of material facts, Adani's motion to strike that document will also be denied as moot. Doc. No. 152.

Adani also moves to strike one paragraph of Kazim's affidavit of November 28, 2005, and eight paragraphs of Kazim's affidavit of September 12, 2007. Doc. No. 139. In these paragraphs, Kazim takes the position that, considering the parties' prior course of dealing and mutual understanding of their respective obligations, no contract could exist between the parties in the absence of a signed, written document. Doc. Nos. 134-5, ¶¶ 8-9, 134-6, ¶ 4. He also states (after reviewing documents concerning Adani's dealings with GNFC) that the coal which Adani was preparing to supply to GNFC had different specifications than the coal referenced in AMCI Export's offer of December 10, 2003. Doc. No. 134-5, ¶ 40. Adani apparently believes that Kazim's testimony constitutes "expert" testimony. Doc. No. 153, p. 2. The Court, however, does not agree with Adani's characterization of Kazim's testimony as "expert" testimony. Kazim was AMCI Export's agent in India, and he negotiated contracts on behalf of AMCI Export (including the contract which Adani contends was formed, and breached, in this case). Kazim's testimony is based on his personal experience, and it goes straight to the heart of the issue in this case. Adani's motion to strike portions of the Kazim affidavits will be denied. Doc. No. 139.

Before addressing the underlying question of whether a contract was formed, the Court will address AMCI Export's argument that the "contract" between Adani and AMCI (assuming *arguendo* that a contract was formed) cannot be enforced because of the Statute of Frauds. Doc.

---

purpose of disposing of the parties' motions for summary judgment.

[2]The Court expresses no opinion as to the admissibility of Gubbins' testimony.

No. 132, pp. 16-18, 20.  The Statute of Frauds is not a rule of evidence, and it has no bearing on the determination as to whether a contract was actually formed.  Instead, "[i]t simply makes unenforceable those contracts that do not have the support of some signed writing."  *Rapoca Energy Company, L.P. v. AMCI Export Corporation*, 2001 WL 401424, at *4, 2001 U.S. Dist. LEXIS 6045, at *11 (W.D.W.Va. April 17, 2001).  Pennsylvania's Statute of Frauds is codified at 13 Pa.C.S. § 2201, which provides, in pertinent part, as follows:

> **§ 2201.  Formal requirements; statute of frauds**
> **(a) General rule.**–Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.  A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.
> **(b) Writing confirming contract between merchants.**–Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (a) against such party unless written notice of objection to its contents is given within ten days after it is received.

13 Pa.C.S. § 2201(a)-(b).  Under Pennsylvania law, several writings may collectively satisfy the Statute of Frauds "if they bear an express reference [to one] another or internal evidence of their interrelation."  *Conaway v. 20th Century Corporation*, 420 A.2d 405, 411 (Pa. 1980). Nevertheless, writings which merely show that the parties are negotiating a potential contract do not satisfy the Statute of Frauds.  *Id.*

The express language of the UCC equates a "seasonable expression of acceptance" with a "written confirmation."  13 Pa.C.S. § 2207(a).  Kazim's memorandum of January 10, 2004, to Mittal acknowledged in writing Adani's "confirmation of purchase" of coal supplied by AMCI Export.  Doc. No. 129-2, p. 26.  This memorandum came within the context of various written communications and emails concerning AMCI Export's offer of December 10, 2003.  Although the Court is unaware of any Pennsylvania court decisions addressing the question, many courts applying the UCC in other jurisdictions have concluded that emails may be used to satisfy the

Statute of Frauds.  *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1362 (Fed. Cir. 2005); *Cloud Corporation v. Hasbro, Inc.*, 314 F.3d 289, 295-296 (7ᵗʰ Cir. 2002); *Bazak International Corporation v. Tarrant Apparel Group*, 378 F.Supp.2d 377, 383-388 (S.D.N.Y. 2005); *International Casings Group, Inc. v. Premium Standard Farms, Inc.*, 358 F.Supp.2d 863, 872-875 (W.D.Mo. 2005); *Roger Edwards, LLC v. Fiddes & Son, LTD*, 245 F.Supp.2d 251, 257-261 (D. Me. 2003); *Central Illinois Light Company v. Consolidated Coal Company*, 235 F.Supp.2d 916, 919 (C.D.Ill. 2002); *Commonwealth Aluminum Corporation v. Stanley Metal Associates*, 186 F.Supp.2d 770, 772-774 (W.D.Ky. 2001).  Although it is yet to be determined whether a contract was formed, the Court is convinced that the Statute of Frauds will not preclude the enforcement of the contract (assuming *arguendo* that one was formed) against AMCI Export in this case.  The series of written communications presently before the Court is sufficient to satisfy the requirements of § 2201.  The Court finds AMCI Export's argument to the contrary to be unpersuasive.  Doc. No. 132, pp. 16-18, 20.

The ultimate question of contract formation, of course, must still be addressed. Pennsylvania's version of the UCC governs the issue of contract formation.  The relevant statutory provisions provide:

> **§ 2204.  Formation in general**
> **(a) General rule.–**A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
> **(b) Effect of undetermined time of making agreement.–**An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
> **(c) Effect of open terms.–**Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.
>
> ***
> **§ 2206.  Offer and acceptance in formation of contract**
> **(a) General rule.–**Unless otherwise unambiguously indicated by the language or circumstances:
> (1) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances; and
> (2) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the

prompt or current shipment of conforming or nonconforming goods, but such a shipment of nonconforming goods does not constitute an acceptance if the seller seasonably notifies the buyer that the shipment is offered only as an accommodation to the buyer.

**(b) Beginning requested performance without notice.**–Where the beginning of a requested performance is a reasonable mode of acceptance an offeror who is not notified of acceptance within a reasonable time may treat the offer as having lapsed before acceptance.

13 Pa.C.S. §§ 2204, 2206. The Court acknowledges that the purpose of the UCC was to create clear rules of law to govern contracts for the sale of goods, and that it is contrary to the statutory policy to turn the issue of contract formation over to a lay jury's unbridled sense of equity. *Mead Corporation v. McNally-Pittsburg Manufacturing Corporation*, 654 F.2d 1197, 1206 (6th Cir. 1981). For this reason, the question of whether a contract has been formed is a question of law for the Court if the evidence of contract formation consists *solely* of writings, or if the material facts are not disputed by the parties. *Lincoln National Life Insurance Company v. Prodromidis*, 862 F.Supp. 10, 13 (D.Mass. 1994). Nevertheless, where material facts are in dispute, "what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact[.]" *Johnston The Florist, Inc. v. Tedco Construction Corporation & O'Neil Personal Care Corporation*, 657 A.2d 511, 516 (Pa.Super.Ct. 1995). Under Pennsylvania law, a party's intent to contract is generally treated as a question of fact. *Viola v. Bocher*, 740 A.2d 1176, 1178 (Pa. 1999). In this respect, Pennsylvania law is consistent with the law applicable in most jurisdictions. *AGA Shareholders, LLC v. CSK Auto, Inc.*, 467 F.Supp.2d 834, 846-847 (N.D.Ill. 2006)(recognizing that the parties' intent as to contract formation is a question of fact under Illinois law); *Flanagan v. Consolidated Nutrition, L.C.*, 627 N.W.2d 573, 579 (Iowa Ct. App. 2001)(treating the issue of contract formation under the UCC as a question of fact); *East River Savings Bank v. Secretary of Housing and Urban Development*, 702 F.Supp. 448, 456 (S.D.N.Y. 1988)("It is a question of fact whether a party's conduct reflects an intent to be bound by an agreement."). The burden is on the plaintiff (i.e., Adani) to prove the existence of a contract by a preponderance of the evidence. *Viso v. Werner*, 369 A.2d 1185, 1187 (Pa. 1977).

Relying on the language of the UCC, Adani argues that a contract between Adani and

AMCI Export was formed as a matter of law. Doc. No. 130, pp. 9-24. AMCI Export contends that the parties' prior course of dealing indicates that the parties' did not intend to be bound in the absence of a signed, written document. Doc. No. 132, pp. 10-12. In support of its position, AMCI Export relies on the decision of the United States Court of Appeals for the Third Circuit in *Brisbin v. Superior Valve Company*, 398 F.3d 279 (3d Cir. 2005). In *Brisbin*, the Court of Appeals relied in part on two parties' prior course of dealing to determine that they did not intend to be bound by an alleged oral agreement. *Brisbin*, 398 F.3d at 293. Nevertheless, there was additional evidence contained in the record which indicated that no final agreement had been reached as to essential terms such as price, quantity and contract duration. *Id.* Moreover, *Brisbin* was on appeal to the Court of Appeals *after a bench trial*. *Id.* at 282. This matter is before the Court on cross-motions for summary judgment. Although the Court of Appeals, in *Brisbin*, concluded that "no contract was formed as a matter of law[,]" it did so on the basis of a magistrate judge's finding that there had been "no meeting of the minds as to price, quantity and contract duration." *Id.* at 293 (internal quotation marks omitted). Given both the present posture of this case and the current state of the record, it is clear that *Brisbin* is not controlling.

Under Pennsylvania law, "[i]f the parties agree upon essential terms and intend them to be binding, a contract is formed even though they intend to adopt a formal document *with additional terms* at a later date." *Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Board*, 739 A.2d 133, 136 (Pa. 1999)(internal quotation marks omitted; emphasis added), quoting *Johnston v. Johnston*, 499 A.2d 1074, 1076 (Pa.Super.Ct. 1985). "The fact that the parties intended subsequently to execute a signed writing does not preclude a finding that a contract was formed: if the minds of the parties met and the essential provisions of the contract were agreed upon, the contract was created, and the later writing is simply evidence of the agreement." *Flight Systems, Inc. v. Electronic Data Systems Corporation*, 112 F.3d 124, 129 (3d Cir. 1997). It is, of course, true that contracting parties may not intend to be bound in the absence of a signed writing. Nonetheless, the law does not presume such an intent. *Wisdom Import Sales Company, L.L.C. v. Labatt Brewing Company*, 339 F.3d 101, 109 (2d Cir. 2003)(recognizing that, under New York law, "oral agreements are binding and enforceable absent a clear expression of the parties' intent to be bound only by a writing"). In *Visiting Nurse*

*Association v. VNA Healthcare, Inc.*, 347 F.3d 1052 (8th Cir. 2003), the United States Court of

Appeals for the Eighth Circuit explained:

> [A]n oral agreement is unenforceable if the parties did not intend to be bound by it
> until it had been reduced to writing.  Any such intent, however, must be clear.  For
> example, the law will not imply the necessity of a writing simply because the
> parties clearly intend to memorialize their agreement later.

*Visiting Nurse Association*, 347 F.3d at 1054.  Although AMCI Export purports to rely on the

parties' prior execution of written documents in support of its position that no contract could

exist in the absence of a signed writing, it does not argue that its offer of December 10, 2003,

somehow manifested such an intent.  Doc. No. 132, pp. 10-12.

The parties do not dispute that Article 2 of the UCC governs the issue of contract

formation in this case.  "Article 2 relaxes many of the legal formalisms and technicalities of

contract formation associated with the common law of contracts."  *Flanagan*, 627 N.W.2d at

578.  The plain language of the statute makes it clear that "[a] contract for the sale of goods may

be made *in any manner* sufficient to show agreement, including *conduct* by both parties which

recognizes the existence of such a contract."  13 Pa.C.S. § 2204(a)(emphasis added).  "The offer

and the acceptance must be sufficient to manifest objectively the parties' mutual assent to be

bound by a contractual relationship, but no particular exchange of documents is required."

*Superior Boiler Works, Inc. v. R.J. Sanders, Inc.*, 711 A.2d 628, 633 (R.I. 1998)(citation

omitted).  Moreover, § 2206(a)(1) states that "an offer to make a contract shall be construed as

inviting acceptance *in any manner and by any medium* reasonable in the circumstances . . .

[u]nless otherwise *unambiguously* indicated by the language or circumstances[.]" 13 Pa.C.S. §

2206(a)(1)(emphasis added).  The language of AMCI Export's offer of December 10, 2003,

certainly did not include unambiguous *language* indicating that no contract would exist in the

absence of a signed writing.  Doc. No. 129-2, pp. 16-18.  Thus, whether an acceptance could

occur in any manner other than via a signed writing depends on whether the *circumstances*

unambiguously indicated that a signed writing was a prerequisite to the formation of a contract.

The parties agree that they have historically executed signed writings containing the terms

of their contracts.  Exactly why the writings have been prepared, however, is strenuously

disputed by the parties.  AMCI Export contends that the writings were themselves required for the purpose of binding the parties to a contract.  In support of its position, AMCI Export relies on Kazim's affidavits.  Doc. Nos. 134-5, ¶ 9, 134-6, ¶ 4.  In those affidavits, Kazim states that the parties' understanding was that a contract was not formed unless and until a signed writing was executed.  *Id.*  In his deposition, Kazim testified that he would send copies of draft contracts to Thrasher for his approval, and that such approval was necessary before he could sign such contracts on behalf of AMCI Export.  Doc. No. 134-36, p. 10.  AMCI Export's position is that since no signed writing was ever executed concerning its offer of December 10, 2003, the contract upon which Adani bases this action was never formed.

Adani sees the matter quite differently.  Mittal testified that the formal documents evidencing its prior contracts with AMCI Export were executed *after* the contracts had already been entered into.  Doc. No. 129-7, p. 18.  He indicated that the contracts had been formed at the time of acceptance, regardless of whether such acceptance was communicated verbally or in writing.  *Id.*  According to Mittal's testimony, the formal documents were not prepared for the purpose of *creating* contracts.  Indeed, he testified that they were not prepared *for* the parties at all.  Mittal stated that the formal documents memorializing Adani's contracts with AMCI Export were required by shipping companies for the purpose of opening up letters of credit.  *Id.*, pp. 19-20.  Goel went even further in his testimony, claiming that shipments had sometimes been made without a signed document.  *Id.*, p. 29.  Goel testified as follows:

> Q.    Turn to what was previously marked Defendant's AMCI Export Exhibit 16.
>
> A.    What number?
>
> Q.    16.  Do you know what Defendant's Exhibit 16 is?
>
> A.    It is a formal document.
>
> Q.    What kind of formal document?
>
> A.    I must tell you something about this, if you permit me to speak on that.  It is a document which, No. 1, has been never been a necessity between these two parties.  This document was being required by us at the time of opening LC's.  This is the least, if you remove the requirement, it is the

least required document between these two parties. And there are some
cases where even these signed documents was not there and the shipment
was made.

*Id.* Hence, the purpose for the execution of written documents between the parties is very much
in dispute. A genuine issue of material fact exists as to whether the parties intended to be
contractually bound in the absence of a signed writing.

The ultimate question in this case, of course, is whether the particular contract allegedly
breached by AMCI Export was ever formed. The mere fact that the UCC does not require a
written instrument does not mean that a contract was actually formed in the absence of such an
instrument. Nonetheless, both the documentary and testimonial evidence presented by the parties
indicates that a genuine issue of material fact exists as to whether the parties entered into a
contract pursuant to AMCI Export's offer of December 10, 2003.

On December 5, 2003, Goel emailed Kazim, asking for a "formal offer" for the purchase
of coal. Doc. No. 129-2, p. 10. Kazim responded five days later with an "offer" for Adani's
"kind acceptance." *Id.* The offer was apparently extended until January 11, 2004. *Id.*, p. 23.
Kazim and Mittal met on January 9, 2004, at which point the facts become disputed by the
parties. The parties disagree as to whether a contract was formed at this meeting, and their
disagreement is reflected somewhat by the confusion manifested in the documentary evidence.
In a memorandum dated January 10, 2004, AMCI India acknowledged Adani's "confirmation of
purchase" pursuant to the offer of December 10, 2003. *Id.*, p. 26. Mittal responded one day later
via a memorandum confirming Adani's purchase of coal via four vessels. *Id.*, p. 28. The UCC
expressly equates a "written confirmation" with an "acceptance." 13 Pa.C.S. § 2207(a). Adani
bases its argument on the idea that it "accepted" AMCI Export's offer in this manner. Mittal's
memorandum also noted that "freight" would be finalized by January 14, 2004. Doc. No. 129-2,
p. 28.

Mittal and Kazim apparently discussed the issue of freight on January 13, 2004. One day
later, Mittal sent Kazim an email seeking confirmation that the "offer" would stand until January
31, 2004. *Id.*, p. 30. AMCI Export contends that Mittal's request that the "offer" be extended
belies any notion that a contract had been formed on January 9, 2004. On January 17, 2004,

Kazim communicated AMCI Export's agreement to the proposed extension. *Id.* Three days later, Goel expressed Adani's desire to know in advance which shipments would be from Australia and which shipments would be from China. *Id.*, p. 32. Kazim responded by making it clear that AMCI Export could not give up its right to supply coal from either Australia or China on a "shipment to shipment" basis. *Id.* On January 29, 2004, Mittal sent a letter to Kazim confirming Adani's purchase of coal pursuant to the offer of December 10, 2003, and the confirmation of January 10, 2004. *Id.*, p. 43. Mittal's letter expressed his agreement that freight would be finalized on a "shipment to shipment basis" even though it would be a "costly affair" for Adani. *Id.* This second "confirmation" is relied upon by Adani in support of its position that a contract was formed on January 29, 2004, even if it had not already been formed on January 9, 2004. The Court notes that, under the UCC, "[a]n agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." 13 Pa.C.S. § 2204(b).

On January 28, 2004, Goel sent Kazim a letter nominating a vessel for the first shipment of coal pursuant to the alleged contract. Doc. No. 129-2, p. 38. After Kazim forwarded the letter to AMCI Export, Thrasher responded by informing Kazim that AMCI Export had accepted a nomination from a different customer for a February 2004 loading. *Id.*, p. 41. In a subsequent email to Thrasher, Kazim stated that he was not accepting Adani's vessel nomination "for now." *Id.*, p. 40. Kazim predicted that Adani would "eventually agree for an extended delivery period." *Id.* Thrasher responded by referring to the alternative loading as "a once in a lifetime chance to make some money." *Id.*

Kazim now contends that Adani's nomination of a vessel to pick up coal from Australia was an attempt by Adani both to choose the source of the coal and to create a legal obligation on the part of AMCI Export to supply coal where no such obligation existed. Doc. No. 134-5, ¶ 33. Adani contends that Kazim told Goel that the first shipment would come from Australia, and that the vessel had been nominated for that reason. Doc. No. 141, p. 21. In his deposition, Kazim denied that he had committed to loading the first shipment of coal from Australia. Doc. No. 134-36, p. 15. Nevertheless, the documentary evidence tends to support Adani's position that Kazim decided not to accept Adani's vessel nomination *solely* because AMCI Export had opted to make

a different shipment its priority. Doc. No. 129-2, p. 40 ("Although the pressure is tremendous from Rajesh Adani & Pradeep Mittal, i'm not accepting their vessel nomination for now. I've verbally informed them that loading will be delayed until April. We'll watch the situation then & act accordingly.").

In his deposition, Thrasher testified that AMCI Export and Adani had never agreed on the terms of the alleged contract. Doc. No. 134-3, p. 11. He indicated that Kazim was not authorized to conclude an agreement with Adani without clearing the terms of the agreement with AMCI Export. *Id.* Thrasher testified that, in his view, there was no "legally binding contract" between AMCI Export and Adani. *Id.* The documentary evidence indicates that Thrasher and Kazim may have been confused as to whether a contractual relationship with Adani had been established. In an email to Kazim dated February 29, 2004, Thrasher spoke as if a contract was in existence. Doc. No. 129-2, p. 97 ("Since we are not a party to Adani's contracts with their domestic clients, and our contract with Adani was not for a specific domestic client, we cannot accept responsibility for their exposure to these customers."). In his response to Thrasher, Kazim clarified that AMCI Export did not have a "signed contract" with Adani. *Id.*

There is no question that Kazim was concerned about AMCI India's business relationship with Adani. In an email to Rhodes dated March 11, 2004, Kazim expressed concern that Adani would end its business relationship with AMCI India. Doc. No. 129-3, p. 5. He was apparently avoiding contact with Adani personnel because he did not want to "mislead" them about AMCI Export's intentions. *Id.* Kazim acknowledged that Adani was "losing a lot of money trying to buy replacement tonnage." *Id.* He stated that AMCI Export should consider giving Adani "one cargo" or, in the alternative, "monetary compensation." *Id.* The critical question, of course, is whether Kazim's desire to provide Adani with either "one cargo" or "monetary compensation" stemmed solely from his desire to protect a business relationship, or whether it was also based on a perceived legal obligation arising from a contract to which AMCI Export was a party.

Adani's position is buttressed by Goel's deposition testimony. On February 17, 2006, Goel testified as follows:

> Q.     Did Mr. Kazim ever tell you that he did not believe there to be a contract between AMCI and Adani?

A.      Never.  He has always maintained his statements, what he was writing in email, also.  That this is the relationship of Adani and AMCI.  And they are going to perform this contract.  They are going to perform this contract.  And it has always been told by him that look, there could be some delays because of all the problems which he mentioned in his mail.  And I tried to convince him look, it is not a problem from your side.  And but he has always confirmed me again and again that look, the contract is there.  Agreement is there.  And we are going to perform.

Q.      Isn't it true that Mr. Kazim told you that he was trying to help Adani out because of the relationship, but there was no contract in place?

A.      I don't think that anybody can help anybody taking a loss only because of relationship.

Q.      When you--

A.      He was in the obligation to supply.  And he was referring to that obligation only.

Q.      Are you saying Mr. Kazim specifically said to you the words "there is a contract in place"?

A.      He said it verbally so many times.  If you refer to the mail sent by him to me and to all of my other colleagues, he had said again and again, "Look, there is a contract.  There is a performance.  And we are going to perform."  It is never disputed there is no contract.

Q.      I can read the documents.  My question is the verbal discussions you contend you had with Mr. Kazim, are you saying that he used the word "contract" in those discussions regarding the contract which Adani has alleged in this case?

A.      He was using the word like "agreement", "contract", "commitment".

Q.      Is there a difference, to your understanding, between an agreement and a contract?

A.      I don't see any difference between agreement and contract.

Doc. No. 143-53, p. 4.  Goel's testimony clearly supports Adani's argument that Kazim's desire to accommodate Adani's need for coal shipments was based on a perceived legal obligation

incurred by AMCI Export rather than on a more generalized desire to maintain a good business relationship with a regular customer.

Goel's testimony, of course, is clearly contradicted by Kazim's deposition testimony. On March 14, 2007, Kazim testified that the parties did not consider themselves to be legally bound until after the execution of a written document signed by both parties. Doc. No. 134-36, p. 24. In support of its position, AMCI Export contends that Adani submitted a draft agreement on February 6, 2004, and that Adani was attempting to get AMCI Export to sign the document for the purpose of *creating* a contract (rather than for the purpose of *memorializing* a contract that had already been formed). Doc. No. 132, p. 19. Goel acknowledged that this document was never signed by the parties. Doc. No. 143-53, p. 5. He testified that he had prepared it on January 29, 2004, after speaking with Kazim. *Id.*, p. 4. Nevertheless, it was Goel's understanding that the document needed to be signed for the purpose of opening a letter of credit. *Id.*, p. 5. He also testified that letters of credit were usually not opened until *after* the nomination of a vessel. *Id.* At what point the parties intended to be bound is the dispositive question.[3]

The UCC provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." 13 Pa.C.S. § 2204(a). The record contains sufficient evidence to enable a reasonable finder of fact to conclude that Adani and AMCI Export entered into the contract upon which Adani bases this action. Kazim's suggestion that AMCI Export provide Adani with either "one cargo" or "monetary compensation" could be viewed as conduct which recognizes the existence of a contract. Doc. No. 129-3, p. 5. Nonetheless, the parties' history of memorializing all of their contracts via signed writings, while not dispositive in this case, lends support to AMCI Export's argument that it did not consider itself to be bound in the absence of a signed

---

[3]AMCI Export contends that Adani was deliberately *avoiding* the completion of a contract because it was hoping to purchase coal from an alternative supplier in order to accommodate the needs of its Indian customers. Doc. No. 132, p. 4. Adani acknowledges that it was engaged in simultaneous negotiations with Chinese suppliers to purchase coal, arguing that it wanted to supplement, rather than supplant, the coal that it sought to purchase from AMCI Export. Doc. No. 141, p. 23. This dispute, while collateral to the parties' objective manifestations to each other, further serves to illustrate why the issue of contract formation in this case must be resolved by the trier of fact.

writing.  AMCI Export's position is buttressed by Goel's concession that a draft agreement presented by Adani (which incorporated the terms of the contract allegedly entered into pursuant to AMCI Export's offer of December 10, 2003) was never signed by the parties.  Doc. No. 143-53, pp. 4-5.  Hence, the Court is convinced that a genuine issue of material fact exists as to whether the parties entered into a binding contract.

AMCI Export contends that Adani cannot maintain this breach of contract action because of Adani's failure to supply a letter of credit.  Doc. No. 132, pp. 20-21.  The applicable provision of the UCC provides that "[f]ailure of the buyer seasonably to furnish an agreed letter of credit is a breach of the contract for sale."  13 Pa.C.S. § 2325(a).  The relevant portion of the December 10, 2003, offer provides:

| Payment | * 100% based on presentation of standard load-port shipping documents under confirmed L/C opened through a first class/prime bank |
|---|---|

Doc. No. 129-2, p. 18.  AMCI Export argues that Adani's opening of a letter of credit was a condition precedent to its obligation to perform under the contract.  Doc. No. 132, p. 21.  Adani responds by arguing that the payment term in AMCI Export's offer was not a "condition precedent" under Pennsylvania law.  Doc. No. 141, p. 24.

Pennsylvania law defines a "condition precedent" as "a condition which must occur before a duty to perform under a contract arises."  *Davis v. Government Employees Insurance Company*, 775 A.2d 871, 874 (Pa.Super.Ct. 2001).  Under the UCC, the question of whether a letter of credit is deemed to be a condition precedent to the *formation* of a contract is generally treated as a question of fact.  *Blair International, Ltd. v. LaBarge, Inc.*, 675 F.2d 954, 957 (8th Cir. 1982)("Although this court has recognized that a letter of credit may be a condition precedent to the *formation* of a contract under Article 2 of the Uniform Commercial Code, the question of whether the parties intended a letter of credit to be a *prerequisite* to contract *formation* or merely a condition of the contract is a question of fact.")(emphasis added).  Under Pennsylvania law, "[w]hile the parties to a contract need not utilize any particular words to create a condition precedent, an act or event designated in a contract will not be construed as constituting one unless that *clearly* appears to have been the parties' intention."  *Davis*, 775 A.2d

at 874 (emphasis added). The payment term in AMCI Export's offer to Adani does not *clearly* indicate that the opening of a letter of credit was a condition precedent to AMCI Export's duty to perform under the contract. Moreover, the record contains evidence which contradicts AMCI Export's position on this issue. AMCI Export bases much of its case on the contention that the parties considered themselves to be contractually bound upon the signing of a formal written document. As noted earlier, however, both Mittal and Goel testified that a letter of credit could not be opened until *after* the signing of a formal document. Doc. No. 129-7, pp. 20, 29. According to Mittal and Goel, that is precisely *why* Adani and AMCI Export signed written documents throughout the history of their business relationship. *Id.* This testimony, if believed, would clearly refute any notion that the parties intended the opening of a letter of credit to be a condition precedent to the *formation* of a contract. In the alternative, the Court agrees with Adani's argument that it was entitled to "suspend [its] own performance" within the meaning of 13 Pa.C.S. § 2610(3) because of AMCI Export's obvious repudiation of the contract. *Tennisland, Inc. v. Precision Tennis Systems, Inc.*, 437 F.Supp. 339, 341-343 (W.D.Pa. 1977). For these reasons, Adani's failure to open a letter of credit does not entitle AMCI Export to summary judgment.

## Conclusion

At the present time, the Court's inquiry is limited to the issue of contract formation. "The Uniform Commercial Code, its draftsmen mindful of the haste and sloppiness, and disregard for lawyerly niceties, that characterize commercial dealing, tolerates a good deal of incompleteness and even contradiction in offer and acceptance." *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227, 1230 (7th Cir. 1995). Thus, the Court cannot conclude as a matter of law that no contract was formed between Adani and AMCI Export. Nevertheless, in light of the ongoing discussions between the parties after the contract was allegedly formed and the parties' long history of reducing the terms of their agreements to writing, the Court cannot conclude as a matter of law that the parties formed a binding contract. Under these circumstances, the question of whether a contract was formed must be resolved by the trier of fact. *Flanagan*, 627 N.W.2d at 579. Accordingly, the Court will deny both motions for summary judgment. Doc. Nos. 128 & 131. Adani's motion to strike portions of the Kazim

affidavits will be denied on the ground that Kazim's testimony cannot be fairly characterized as "expert" testimony, and Adani's other two motions to strike will be denied on the ground that they are moot.  Doc. Nos. 137, 139 & 152.  An appropriate order follows.

McVerry, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ADANI EXPORTS LIMITED,       )
                                   )
        **Plaintiff,**        )
                                   )
       **v.**            )     **Civil Action No. 05-304**
                                   )
AMCI EXPORT CORPORATION,   )
AMERICAN METALS & COAL      )
INTERNATIONAL, INC., K-M        )
INVESTMENT CORPORATION,    )
FRITZ R. KUNDREN, HANS J.     )
MENDE, ERNIE THRASHER, XCOAL )
ENERGY & RESOURCES and      )
XCOAL ENERGY & RESOURCES,   )
LLC,                             )
        **Defendants.**     )

## ORDER OF COURT

AND NOW, this 4th day of December, 2007, in accordance with the foregoing memorandum opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that Plaintiff's Motion for Summary Judgment (*Document No. 128*) is **DENIED**, that Defendant's Motion for Summary Judgment (*Document No. 131*) is **DENIED**, that Plaintiff's Motion to Strike portions of Kazim's affidavits (*Document No. 139*) is **DENIED**, and that Plaintiff's Motions to Strike the Gubbins affidavit and Defendant's Supplemental Concise Statement of Material Facts (*Document Nos. 137 & 152*) are **DENIED AS MOOT**. A status conference with counsel and the Court is hereby scheduled on Wednesday, December 12, 2007, at 2:00 P.M.

                                              BY THE COURT:

                                            s/ Terrence F. McVerry
                                            United States District Court Judge

cc:    Buchanan Ingersoll & Rooney PC
       301 Grant Street
       One Oxford Centre, 20th Floor

Pittsburgh, PA 15219
Bruce A. Americus
Thomas L. VanKirk
Stanley J. Parker
S. Manoj Jegasothy
Daniel C. Garfinkel

Thelen Reid Brown Raysman & Steiner LLP
701 Eighth Street, N.W.
Washington, D.C. 20001
Gerald Zingone
Byron L. Pickard

Leech Tishman Fuscaldo & Lampl
Citizens Bank Building, 30th Floor
525 William Penn Place
Pittsburgh, PA 15219
Manning J. O'Connor II
Douglas C. Hart